**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **UNITED RENTALS, INC., and UNITED RENTALS (NORTH AMERICA), INC.,**<br><br>Plaintiffs,<br><br>v.<br><br>**SHANE WAITES,**<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No.: 3:26-cv-02046<br><br><br><br>November 24, 2026 |

## COMPLAINT

The plaintiffs, United Rentals, Inc., and United Rentals (North America), Inc. (collectively, "United," the "Company," or "Plaintiff"), by and through their undersigned attorneys, and for their Complaint for injunctive and other relief against the defendant, Shane Waites ("Defendant"), hereby state and allege the following:

## NATURE OF ACTION

1. This action asserts claims for breach of an Employment Agreement electronically accepted by Defendant on November 4, 2022 (the "Agreement").

2. United is engaged in the business of renting and selling equipment and merchandise to the commercial and general public, including, but not limited to, customers in Texas and throughout the United States and Canada.

3. For more than ten years, Defendant was employed by United in its Fluid Solutions business. From January 2023 until his resignation on September 25, 2026, Defendant served as a Region Product Development Manager ("RPDM") for Fluid Solutions, a role in which he was one

of United's most experienced Fluid Solutions subject matter experts. In that role, Defendant managed a book of national and strategic accounts that operate throughout North America; served as United's Fluid Solutions lead for government sales throughout the United States and Canada; and, beginning in January 2026, served as United's primary resource for a fast-growing mechanical flushing initiative, with responsibility extending from Texas north to Minnesota and east to the East Coast.

4. United maintains its primary servers in Connecticut, is based in Connecticut, and the subject confidential information and property are owned by United and reside in Connecticut.

5. The Agreement prohibits Defendant from, among other things: communicating or disclosing to any person or entity, without the Company's prior written consent, any Trade Secrets or other Confidential Information (as defined in the Agreement); using any such Trade Secrets or Confidential Information except in the furtherance of the business of United or other than as directed by United in writing; and/or copying, deleting, removing and/or retaining any Trade Secrets, Confidential Information, or other Company property, in any form, except in the furtherance of the business of United.

6. Additionally, published United policy prohibits Company employees from deleting or wiping United data or systems, including through the use of secure-erasure programs, as well as any other impairment of the confidentiality, integrity and availability of data on Company devices.

7. The Agreement also requires Defendant to "faithfully adhere to, execute and fulfill all policies established by the Company."

8. The Agreement further prohibits Defendant, during his employment with the Company and for 12 months after termination, from competing with the Company in a limited and

defined "Restricted Area," and requires Defendant to provide United with prior written notice before taking any position during that 12-month period.

9. Notwithstanding the above, Defendant has violated numerous obligations owed to the Company under Company policy and the Agreement, including by:

a. becoming employed by Opifex-Synergy and/or its affiliate(s) (collectively, "Synergy"), a direct competitor of United, as the President of its Pump Division, based in the Dallas–Fort Worth area, within the Restricted Area;

b. failing to provide United with prior written notice of his new position, as the Agreement requires;

c. wiping (secure erasing) the United-owned iPhone he utilized while employed by United;

d. deleting at least 122 files of United information from his United-issued laptop computer four days before he resigned; and

e. using external storage devices in connection with United's information and property, and failing to return those devices or the United information and property on them.

10. Defendant's conduct breaches multiple provisions of his Agreement with United.

11. Defendant's conduct also violates Company policy, which, in turn, violates Defendant's contractual obligation to "faithfully adhere to, execute and fulfill all policies established by the Company."

## THE PARTIES

12. Each Plaintiff is a Delaware corporation with its principal place of business in Stamford, Connecticut. United conducts business in Fairfield County, Connecticut, and in branch offices nationwide.

13. Upon information and belief, Defendant is not domiciled in Connecticut or Delaware. Rather, upon information and belief, Defendant is a citizen of Texas.

## VENUE AND JURISDICTION

14. Jurisdiction over this matter arises under 28 U.S.C. § 1332 (diversity of citizenship). The amount in controversy exceeds $75,000, exclusive of interest and costs.

15. In the Agreement, the parties agreed that the interpretation and enforcement of the provisions of such Agreement shall be resolved and determined exclusively by the state court sitting in Fairfield County, Connecticut, or the federal courts in the District of Connecticut, and the parties further agreed that such courts shall have exclusive jurisdiction for such purpose. Thus, this Court has exclusive personal jurisdiction over Defendant with respect to United's claims under the Agreement.

16. In the Agreement, Defendant further acknowledged that, "in the performance of his or her duties, Employee will maintain significant contacts with the Company's corporate offices and/or infrastructure in Connecticut, including, without limitation, telephone and email contacts with corporate personnel, access to corporate databases and other data and intellectual property maintained in Connecticut, required attendance at certain training and/or strategic meetings, and payment of business related travel and entertainment expenses."

17. As an RPDM, Defendant's responsibilities extended into Connecticut.

18. Venue is proper in this District because, in the Agreement, the parties contractually submitted to the exclusive jurisdiction of the state and federal courts sitting in Connecticut.

## FACTUAL ALLEGATIONS

### UNITED'S BUSINESS

19. United is a diversified company engaging in a wide range of businesses primarily related to renting and selling equipment and merchandise to the commercial and general public, including construction equipment, earthmoving equipment, aerial work platforms, traffic safety equipment, trench safety equipment, pumps, tanks, filtration, power and HVAC equipment, industrial equipment, sanitation equipment, landscaping equipment, home repair equipment, maintenance equipment, contractor supplies, general tools, portable storage containers, mobile offices, modular buildings, modular space solutions, storage trailers, liquid containment solutions, refrigerated containers, containerized walkways, containerized accommodation units, storm shelters, chassis, light equipment and specialty equipment, as well as the buying of companies that engage in such activities, along with the training and computer systems designed, developed and utilized with respect to support any of the foregoing.

20. In particular, as is most relevant to this matter, United's Fluid Solutions business rents and sells pumps, tanks, filtration and related equipment, and provides associated engineering, installation, operation and other services, including, among other things, bypass pumping, dewatering, fluid transfer, filtration, and mechanical flushing of hydronic and other piping systems to municipal, governmental, industrial and commercial customers throughout North America, including general contractors, mechanical contractors and other entities involved in the construction and commissioning of data centers.

## DEFENDANT'S EMPLOYMENT AND THE AGREEMENT

21. Defendant began working for United on or about January 18, 2016.

22. Before his promotion to RPDM, Defendant served as a District Sales Manager for United's Fluid Solutions business in its Central South district, which encompassed central and west Texas and western Louisiana.

23. By letter dated November 1, 2022, United offered Defendant a promotion to the position of Region Product Development Manager. The offer letter expressly provided that Defendant's "offer is contingent upon your signing of the employment agreement." Consideration for Defendant's execution was described in the offer letter.

24. Defendant electronically accepted the offer on November 3, 2022.

25. On November 4, 2022, Defendant electronically accepted the Agreement. In doing so, Defendant certified, among other things, that he had "read and underst[ood] the Employment Agreement," had "had an opportunity to review it with counsel of [his] choosing," and "recognize[d] that it is a legally binding contract," and he "assent[ed] to and consent[ed] to be bound by the terms and conditions of this Employment Agreement."

26. Defendant's promotion to RPDM became effective on or about January 2, 2023.

27. An RPDM "acts as a single point of contact for Fluid Solutions products and services for the National & Strategic Accounts in their book of business," and "is the Fluid Solutions liaison with national account managers, government account managers, strategic account managers, and sales representatives from all Company business units." Among other things, an RPDM is responsible, "[i]n partnership with National Account Managers, to manage rate structure and strategies for National Accounts." The position requires "[u]p to 60% overnight travel."

28. RPDMs are among United's most experienced Fluid Solutions subject matter experts. In addition to managing a book of accounts, a significant part of the RPDM role is supporting the network of managers and sales representatives throughout the Fluid Solutions business, including through product training, technical support, lead generation and business development, and the sharing of market and competitive intelligence.

29. Defendant's book of business as an RPDM consisted of national and strategic accounts that operate throughout North America, and Defendant's work on those accounts was not confined to any particular office or geographic territory.

30. From the time of his promotion through January 2026, Defendant also served as United's Fluid Solutions lead for government sales throughout the United States and Canada. In that role, among other things:

a. Defendant identified himself in Company communications as the "Government-Regional Product Development Manager";

b. Defendant prepared and distributed, on a regular basis, government revenue reports to Fluid Solutions outside sales representatives, branch managers and district sales managers throughout the United States and Canada, ranking government rental revenue by sales representative, district and branch, and attaching full reports containing government rental and equipment sales revenue data for every Fluid Solutions district in the United States and Canada, down to the branch and customer level; and

c. Defendant offered and provided support to United's Fluid Solutions sales force regarding target accounts, call strategy, and the use of state and cooperative purchasing contracts "in the US and Canada."

31. Defendant continued to perform that government work during the two-year period preceding the termination of his employment. For example, in February 2026, Defendant distributed United's January 2026 Fluid Solutions government revenue results for the United States and Canada, together with the full report "with district and branch details."

32. Beginning in January 2026, Defendant served as one of United's primary resources for its nationwide mechanical flushing initiative, which experienced significant growth driven in part by the construction and commissioning of data centers. In this role, Defendant supported Fluid Solutions branches, sales personnel, and customer opportunities throughout the United States. His responsibilities also included developing and expanding relationships with mechanical contractors engaged in a broad range of commercial and industrial projects, including contractors involved in the construction and commissioning of data centers. Defendant's responsibilities extended nationwide and beyond his customer base.

33. Defendant played a significant role in the development and expansion of United's mechanical flushing business nationwide. Among other things, Defendant also participated in recurring weekly strategic discussions with United's leadership, sales, engineering, and operational personnel regarding business growth, market opportunities, fleet requirements, equipment investments, engineering capacity and capabilities, and sales strategies associated with the mechanical flushing initiative.

34. Throughout his RPDM tenure, Defendant was based at United's Fluid Solutions branch in Dallas, Texas, where he had his own office.

**DEFENDANT'S ACCESS TO UNITED'S CONFIDENTIAL INFORMATION**

35. As a result of his positions, Defendant was entrusted with, utilized, and helped develop United's confidential and proprietary information, including, but not limited to, the following:

a. *Government Account Information.* Defendant compiled, analyzed and distributed customer-level revenue data for United's Fluid Solutions government customers across every Fluid Solutions district in the United States and Canada, including rental and equipment sales revenue by customer, branch and district, as well as United's target accounts and strategies for pursuing municipal and other government business.

b. *National and Strategic Account Information.* Defendant managed United's Fluid Solutions relationships with national and strategic accounts and, in partnership with United's National Account Managers, managed rate structures and strategies for those accounts.

c. *Mechanical Flushing Strategy and Methods.* Defendant was one of United's primary resources supporting the nationwide development and expansion of its mechanical flushing business. Through this role, Defendant had access to confidential business strategies, market development plans, customer and mechanical contractor relationships, sales opportunities, pricing strategies, fleet requirements, and engineering capabilities associated with the initiative. Defendant also participated in discussions concerning United's national growth strategy, target markets, resource allocation, and specialized equipment investments, and had

access to internal technical information and engineering approaches used to develop and execute mechanical flushing projects.

d. *Fleet Information.* Defendant had knowledge of, and influenced, United's fleet expenditures and fleet planning for its Fluid Solutions business.

e. *Market Coverage and Sales Methods.* Defendant had access to and utilized United's market coverage methodology, account prioritization and assignment data, and sales force data, including information maintained in United's Salesforce system.

36. In the Agreement, Defendant acknowledged that United's "Confidential Information" includes, among other things, "business, strategic and marketing data, plans and forecasts, and the past results of such plans and forecasts"; "business, pricing and management methods and/or information, as well as the accumulation, compilation and organization of such methods and/or information"; "finances, strategies, systems, research, surveys, plans, reports, recommendations, conclusions, data, contracts, drawings, sketches, maps, and other business information"; "arrangements with, preferences, pricing and discount history, related proposals or correspondence with customers, transaction history, identity of internal contacts, contact cards/information, or other proprietary business information relating to the Company's customers"; "technical information, research, work product and know-how"; and information maintained in United's Salesforce and other systems.

37. Defendant further acknowledged that United's Confidential Information "includes not only the individual categories of information identified in this Section 2, but also the compilation and/or aggregation of the Company's information, which is and has been compiled/aggregated via significant effort and expense and which has value to the Company and to the Company's employees as used in furtherance of the Company's business."

## THE AGREEMENT

38. In the Agreement, Defendant agreed that "Employee shall faithfully adhere to, execute and fulfill all policies established by the Company."

39. In the Agreement, Defendant agreed that, during and at all times after his employment with United, he would not, among other things:

a. "communicate or disclose to any person or entity, without the Company's prior written consent, any Trade Secrets or other Confidential Information (as defined below), whether prepared by Employee or others";

b. "directly or indirectly use any Trade Secrets or other Confidential Information other than as directed by the Company in writing"; and

c. "except in the furtherance of the business of the Company, copy, delete, remove and/or retain any Trade Secrets, Confidential Information, or other Company property, whether in electronic, paper, or other form, from the premises of the Company, or from Company servers, computers, cellular/mobile phones, smartphones, tablets, USB sticks/drives or other devices, without the prior written consent of the Company."

40. Defendant further agreed that, "if Employee has decided to resign, has accepted employment with a competitor, or has been made aware of Employee's planned termination by United (for any reason), Employee shall no longer be authorized to access or use United's Trade Secrets, Confidential Information, devices, computers, networks, servers or systems, for any purpose or to any extent, absent prior written authorization from the Company's General Counsel or authorized representative of the Company's legal department."

41. Defendant acknowledged and agreed that "[a]ll products, correspondence, reports, records, charts, customer contact information, advertising materials, designs, plans, manuals, field guides, memoranda, lists, spreadsheets, documents, electronic files, and other property compiled or produced by Employee or delivered or made available to Employee by or on behalf of the Company or by its customers (including, but not limited to, customers solicited by the Employee), whether or not Confidential Information, shall be and remain the property of the Company, shall be subject at all times to its exclusive direction and control, shall be returned immediately whenever demanded/requested by the Company, and shall not be retained by Employee following termination of employment."

42. Defendant acknowledged and agreed that, "[u]pon termination of employment for any reason whatsoever, or upon request at any time, Employee shall, immediately and in no event more than three (3) business days thereafter: (i) turn over to the Company, and not maintain any copy of, all Company property, data, and information . . . ; (iv) promptly deliver to the Company all originals and copies (whether in note, memo or other document form or on/in the Device(s), Backups, USB drive(s), hard drive(s), video, audio, computer tapes, discs, electronic media, cloud-based accounts, other formats now known or hereinafter devised, or otherwise) of all Trade Secrets or other Confidential Information, and all property identified in Section 2(e) above, that is in Employee's possession, custody or control . . . ; (v) tender to the Company all Company property, including but not limited to any Device(s), Backups, USB drive(s), hard drive(s), video, audio, computer tapes, discs, electronic media, cloud-based accounts, or other electronic devices or formats now known or hereinafter devised, on which Employee stored any Confidential Information, Trade Secrets or Company property; and (vi) arrange with the Company a safe, secure, and complete removal/deletion of any and all remaining electronic copies of any such data

or information . . . ; and (vii) fully cooperate with the Company with respect to any and all remediation, at Employee's expense, which may be necessary or reasonably requested by the Company following any failure of Employee to strictly adhere to the terms of Section 2 of this Agreement."

43. The Agreement also contains certain restrictive covenants, including a geographic noncompete. In particular, Defendant agreed that, during his employment and "for a period of 12 months following the termination of his or her employment for any reason whatsoever, whether or not for cause or by resignation," he would not, "directly or indirectly (whether through affiliates, relatives or otherwise)":

> (i) in any Restricted Area (as hereinafter defined), be employed or retained by any person or entity who or which then competes with the Company in the Restricted Area to any reasonable extent, or directly or indirectly own any interest in any such person or entity or render to it any consulting or other services or any advice, assistance or other accommodation. Employee shall be deemed to be employed or retained in the Restricted Area if Employee has an office in the Restricted Area or if Employee performs any duties or renders any advice in, or with respect to any competitive facility, customer or business activities in, the Restricted Area. A "Restricted Area" means each of:
>
> > (A) a 100 mile radius from any and all Company locations for which Employee performed services, or had management, sales or other responsibilities, at any time during the two year period preceding the termination of his or her employment;
> >
> > (B) the geographic area(s) in which or in relation to which Employee shall have performed any duties, or had management, financial, sales, corporate, or other responsibilities, for the Company during the two year period preceding the termination of his or her employment; and
> >
> > (C) the geographic area(s) in which or about which Employee had involvement in the development, review, use, presentation, or implementation of Confidential Information

> during the two year period preceding the termination of his or her employment.
>
> (ii) be employed or retained anywhere in the Restricted Area by a Similar Entity (as hereinafter defined), or directly or indirectly own any interest in any Similar Entity or render to it any consulting or other services.

44. The Agreement's definition of "Similar Entity" expressly includes, among others, "Synergy Equipment" and "any affiliate or dealer of any of the foregoing."

45. The Agreement further provides:

> Before taking any position with any person or entity during the 12 month period following the termination of his or her employment for any reason, with or without cause or by resignation, Employee will give prior written notice to the Company of the name of such person or entity, as well as the assigned location, title/role, territory(ies), duties and responsibilities related to the position under consideration by Employee. Employee understands and expressly agrees that the obligation to provide written notice under this Section 3(c) is a material term of this Agreement, and that the failure to provide such notice shall be a material breach of this Agreement, and shall constitute a presumption that any employment about which he or she failed to give notice violates Section 3(a) and/or would necessarily result in a violation of Section 3(b) of this Agreement.

46. In the Agreement, Defendant confirmed that the Agreement's restrictions "are reasonable in both duration and geographic scope and will not unduly restrict Employee's ability to obtain a livelihood."

47. Defendant acknowledged that "monetary damages will be inadequate and the Company will be irreparably damaged if the provisions of this Agreement are not specifically enforced," and agreed that, in the event of a breach or threatened breach, United shall be entitled, among other remedies, "to an injunction temporarily, preliminarily, and/or permanently restraining any violation of this Agreement (without any bond or other security being required) by Employee and by any person or entity to whom Employee provides or proposes to provide any services in

violation of this Agreement," and "to require Employee to hold in a constructive trust, account for and pay over to the Company all compensation and other benefits which Employee shall derive as a result of any action or omission which is a violation of any provision of this Agreement."

48. Defendant further agreed that "[i]f Employee breaches any of the covenants set forth in this Agreement, or brings any action challenging this Agreement or its enforcement, Employee agrees to pay all costs (including reasonable attorneys' fees) incurred by the Company in establishing that breach and/or in otherwise defending or enforcing any of the covenants or provisions of this Agreement."

**DEFENDANT'S RESIGNATION AND EMPLOYMENT WITH SYNERGY**

49. On September 25, 2026, Defendant resigned from United, effective that day, by telephone call to his direct supervisor, followed by an email from his personal email account.

50. During the call, Defendant refused to disclose where he was going. He stated that he was not ready to share that information, that he planned to take a month off, and that he would share it afterward. Defendant described his next position as a great opportunity he could not pass up. When Defendant's supervisor reminded him of his noncompete, Defendant responded that it would not interfere with his plans.

51. In his resignation email, Defendant similarly stated that he would "be taking some time for myself to decompress, and we'll talk in a few weeks."

52. Defendant has since claimed that his start date at Synergy was October 12, 2026, seventeen (17) days after his notice of resignation to United.

53. Defendant has also represented that, at Synergy, he holds the title of President, Pump Division; that his assigned location is the Dallas–Fort Worth area; that he is "responsible

for leading and managing the division's team and its back-of-house operations"; and that he has no assigned territory.

54. Defendant did not comply with his obligation under the Agreement to provide United with prior written notice before taking his position with Synergy. Instead, United was forced to demand from Defendant, on October 1, 2026, the information required by Section 3(c) of the Agreement. Defendant did not provide the name of his new employer, or his assigned location, title/role, territory, or duties, until October 12, 2026, the day he claims he began working for Synergy.

**SYNERGY COMPETES WITH UNITED IN THE RESTRICTED AREA**

55. Synergy is a direct competitor of United. Like United, Synergy rents equipment, including general rental equipment, pumps and trench safety equipment, to commercial and other customers. Indeed, in the Agreement, Defendant acknowledged that Synergy is a competitor of United, identifying it by name as a "Similar Entity" by which he may not be employed anywhere in the Restricted Area.

56. Synergy describes itself, including its "Pump Division," on its website, located at synergyequip.com.

57. According to its website, Synergy operates rental branches in, among other places, Texas (including Dallas–Hutchins, Dallas–Melissa, Fort Worth, Houston, Baytown, Austin–Buda, Bryan–College Station, San Antonio–New Braunfels and San Antonio–Schertz), Florida (including dedicated Pump Division branches in Jacksonville, Sarasota and Tampa), Georgia (including Forest Park, Kennesaw and Lawrenceville in the Atlanta area, Byron and Garden City), Tennessee, Alabama, California, Arizona, Nevada, Idaho and Utah. Synergy advertises pumps as an available offering at each of its branches.

58. Synergy advertises that its Pump Division provides "de-watering and fluid transfer solutions," for applications including "sewer lift station and gravity sewer bypass, cooling tower bypass," "sewer and potable water bypass, booster pump stations, temporary fire protection, pipe flushing, and coolant water recirculation," as well as "[t]urnkey water treatments systems" and "turn-key systems from initial design to on-site installation." Synergy further advertises that it "builds in-house over 50% of the pump products we use in our rental fleet."

59. These are the same types of products, services, applications and customers that Defendant was responsible for at United, including in his government sales role and in his mechanical flushing role.

60. As President of Synergy's Pump Division, Defendant is, upon information and belief, responsible for Synergy's pump business wherever it operates, including its strategy and growth, profit and loss, profitability, hiring, fleet decisions and commercial operations.

61. Defendant's employment with Synergy is within the Restricted Area. Among other things:

a. Defendant's office is in the Dallas–Fort Worth area, which is within 100 miles of United's Dallas branch, at which Defendant was based, and within 100 miles of other United locations for which Defendant performed services or had responsibilities, and which is within the geographic areas in which and in relation to which Defendant performed duties and had responsibilities for United;

b. during the two-year period preceding the termination of his employment, Defendant performed duties and had responsibilities for United throughout the United States and Canada with respect to United's government business and its national and strategic accounts, and throughout the area extending from Texas north

to Minnesota and east to the East Coast with respect to United's mechanical flushing business; and

c. Synergy's Pump Division operates, and competes with United, within those same areas, including in Texas, along the Gulf Coast, in Florida, and in Georgia, among other places, and Defendant, as its President, necessarily performs duties and renders advice with respect to competitive facilities, customers and business activities in the Restricted Area.

62. As President of a competing pump business, Defendant is positioned to use, and cannot avoid drawing upon, United's Confidential Information, including its government account information, national and strategic account information, mechanical flushing strategy and methods, and fleet information, to United's detriment.

**DEFENDANT'S DELETION AND RETENTION OF UNITED PROPERTY**

63. The evening before he resigned, Defendant left his United-issued laptop computer and iPhone at United's Dallas branch. United secured the devices and submitted them for forensic examination.

64. The forensic examination revealed that the United-owned iPhone Defendant utilized while employed by United had been reset to factory settings, erasing all of the data on the device. Upon information and belief, Defendant wiped (secure erased) the iPhone before leaving it at the branch.

65. Defendant's conduct in that regard violates Company policy and his Agreement. Among the United policies violated by this conduct is Policy and Procedure Bulletin ("PPB") No. 2F.003: Internet, E-Mail, Electronic Communications and Information Security, which provides:

> Users must not impair the confidentiality, integrity and availability of data on devices. This includes, but not limited to, deleting

> Company related data and software, as well as utilizing methods to "wipe" the system through the use of secure-erasure programs, for example. Such procedures may only be performed, as authorized by IT Security.

66. PPB No. 2F.003 further provides that Company computers and other electronic devices "remain the sole and exclusive property of the Company and must remain fully accessible to the Company at all times."

67. Unless an employee seeks and receives preapproval to wipe a Company device or system, that user is not allowed to access the section, code, program, software or command instructions on or in such device that would allow the employee to wipe or secure erase that device.

68. Unless an employee seeks and receives preauthorization, such employee is prohibited from causing the transmission of a program, information, code, or command, the result of which would intentionally cause damage to a United device, including, but not limited to, the wiping of any United device.

69. Defendant did not seek, and was never given, authorization from United IT Security to:

a. access the section, code, program, software or command instructions on or in the United iPhone that would allow him to wipe that device and/or delete United information from that device; and/or

b. cause the transmission of a program, information, code, or command, the result of which would intentionally wipe the United iPhone and/or delete United information from that device.

70. The forensic examination of Defendant's United-issued laptop also revealed that Defendant deleted a substantial volume of United information shortly before he resigned. On September 21, 2026, four days before he resigned, at least 122 files were sent to the laptop's

recycle bin within a span of approximately thirty seconds. Most of these files had been stored in a desktop folder named "Gov Info," which no longer existed on the laptop when it was left behind; others had been stored in a desktop folder named "SALES." The contents of the deleted files could not be recovered from the recycle bin, which, upon information and belief, Defendant emptied (thereby preventing recovery) before leaving the laptop behind.

71. The deleted files included, among others, files titled "Tampa Gov Accounts list.xlsx," "Orlando Accounts.xlsx," "JD Gov Accounts.xlsx," "I53 Gov Accounts.xlsx," "I30 Gov Accounts.xlsx," "Profit Margins.pptx," "Fluid Solutions Breakdown Dec 2024 - Field Updated 1-16-2025 (005).xlsm," "Copy of Fluid Solutions Breakdown Nov 2024 - Shane.xlsm," "Copy of Fluid Solutions Breakdown Nov 2024 - Field.xlsm," "Financial Future Call Focus.docx," "New 2023 Government Sales Playbook.pdf," "Government Vertical Strategy 2022.pptx," "Fluid Solutions Government Alignment.docx," "Pump Comparison.docx," and "Northeast Gov Presentation Feb 26.pptx."

72. The deletion occurred on the same day that Defendant had connected a personal external storage device, described below, to the laptop, and approximately eight minutes after forensic artifacts reflect user interaction with that device.

73. Upon information and belief, by September 21, 2026, Defendant had already decided to resign from United and/or had accepted employment with Synergy. Accordingly, under the Agreement, Defendant was no longer authorized to access or use United's Confidential Information, devices or systems for any purpose, absent prior written authorization from United's legal department, which Defendant neither sought nor obtained.

74. The forensic examination further revealed that at least ten (10) USB storage devices were connected to Defendant's United-issued laptop between July 2025 and his resignation,

including, but not limited to, the following devices connected in the weeks immediately preceding his resignation:

a. a General UDisk USB drive, connected on August 25, 2026, on which forensic artifacts reflect that files titled "Flush Design Report (Sample).pdf" and "Flush Design Drawing (Sample).pdf" resided and were accessed. These files are United's template for designing and engineering mechanical flush plans for its customers;

b. a Lexar USB flash drive, connected on September 9, 2026; and

c. a Seagate 2TB portable drive, connected on multiple occasions, including on September 18 and September 21, 2026. Forensic artifacts reflect that, at various times, this drive contained folders and files of United information and property, including folders named "Gov Info," "Gov Training Presentations," "Pump Training" and "FS Listings," a file named "Pump Solutions.zip," and United video files.

75. None of these USB storage devices was left with Defendant's Company assets at the time of his separation.

76. United has demanded that Defendant return all United information and property in his possession, including in electronic form, and preserve any drives connected to any United device. To date, Defendant has not returned any such information or property, or any of the USB storage devices described above.

77. The above conduct was neither requested nor approved by United.

78. In light of the foregoing, there is a reasonable risk, and Plaintiff alleges that, upon information and belief, Defendant removed United's information and property from United's possession by copying it to external storage devices, including the Seagate drive, which had itself

contained a folder named "Gov Info," and then deleting it from his United-issued laptop and emptying the recycle bin, such that the copies in Defendant's possession may be the only remaining copies of at least some of that information. Plaintiff further alleges, upon information and belief, that Defendant continues to possess, control or have access to United's confidential information and/or property, and may also possess United's confidential information and other property on other devices or accounts, including Defendant's personal computer(s), storage devices, email account(s), and/or cloud account(s).

79. Any United information on the USB storage devices or other devices or accounts, in the hands of Defendant and/or Synergy, has the ability to significantly harm United if Defendant (and/or Synergy) is allowed to possess, maintain, disclose and/or use it.

80. Defendant acknowledged that United would suffer irreparable harm and agreed that United would be entitled to injunctive relief, in addition to damages, if he breached or threatened to breach any of the restrictive covenants in the Agreement.

81. By engaging in the conduct described in this Complaint, Defendant breached the Agreement.

82. In light of the above, United requests and is entitled to immediate and permanent injunctive relief, in addition to any other relief to which it may be entitled, to avoid suffering irreparable and/or immeasurable harm.

## COUNT ONE

### Breach of the Agreement – Data, Information, Devices

83. United realleges and reincorporates herein by reference the allegations set forth in Paragraphs 1 through 82 above as though fully set forth herein.

84. United and Defendant are parties to a valid and enforceable Agreement.

85. Defendant has breached his obligations owed to United under the Agreement by engaging in the conduct described in this Complaint, including by wiping/erasing United's iPhone; deleting United information from his United-issued laptop; copying, removing and/or retaining United information and property on external storage devices; failing to return United's information, property and the external storage devices on which it was stored; and failing to faithfully adhere to, execute and fulfill Company policy, including PPB No. 2F.003.

86. Defendant's conduct set forth in this Complaint constitutes a material breach of the Agreement.

87. As a result of the foregoing, Defendant is liable to United for breach of contract. As a direct and proximate result of Defendant's wrongful conduct, United has suffered and/or will suffer money damages and irreparable harm for which there is no adequate remedy at law.

**<u>COUNT TWO</u>**

**<u>Breach of Contract – Noncompete</u>**

88. United realleges and reincorporates herein by reference the allegations set forth in Paragraphs 1 through 87 above as though fully set forth herein.

89. United and Defendant are parties to a valid and enforceable Agreement.

90. Defendant has breached and/or will breach his ongoing obligations owed to United under the Agreement by being employed by and/or performing services for a competitor and Similar Entity, Synergy, in the Restricted Area.

91. Defendant further breached the Agreement by failing to provide United with prior written notice before taking his position with Synergy. Under the Agreement, that failure is a

material breach and constitutes a presumption that Defendant's employment with Synergy violates Section 3(a) of the Agreement.

92. Defendant's conduct set forth in this Complaint constitutes a material breach of the Agreement.

93. As a result of the foregoing, Defendant is liable to United for breach of contract.

94. As a direct and proximate result of Defendant's wrongful conduct, United has suffered and/or will suffer money damages and irreparable harm for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for its order and judgment as follows:

A. Judgment in United's favor that Defendant breached the Agreement;

B. Temporary, preliminary and permanent injunctive relief enjoining Defendant from:

1. violating the terms of his Agreement;

2. being employed by/with, or providing any services to, a competitor, including, but not limited to, Synergy, within the Restricted Area during the time specified in the Agreement;

3. using on behalf of himself or a competitor, including, but not limited to, Synergy, or disclosing to a third person, including, but not limited to, Synergy, any confidential information belonging to United;

4. continuing to maintain, possess, use, access or control any United devices, property, or information; and/or

5. soliciting the business of, or calling upon, any person or entity, who or which is or was a customer of United with whom Defendant dealt, whom Defendant solicited or targeted, or about whom Defendant has confidential information, during the period of Defendant's employment, for the purpose of providing or obtaining any product or service reasonably deemed competitive with any product or service then offered by United;

C. An order requiring Defendant to return to United all United information and property, including, but not limited to, the USB storage devices described herein, and to submit any devices and accounts on which United information or property is or has been stored to forensic review and remediation at Defendant's expense;

D. An order requiring Defendant to hold in a constructive trust, account for and pay over to United all compensation and other benefits Defendant has derived or will derive as a result of his violations of the Agreement;

E. The relief provided for in the Agreement;

F. The relief requested in the Counts of this Complaint;

G. Compensatory and/or nominal damages;

H. Attorneys' fees;

I. Interest (prejudgment and post-judgment, as applicable);

J. Costs; and

K. Such other and further relief, legal and equitable, that this Court deems just and proper.

Dated this 24 day of November, 2026.

THE PLAINTIFFS
UNITED RENTALS (NORTH AMERICA), INC.
UNITED RENTALS, INC.

By: _*/Gerald C. Pia, Jr./*_________________

Brian C. Roche - ct 17975
Gerald C. Pia, Jr. - ct 21296
Roche Pia, LLC
4 Research Dr., Ste 402
PMB# 543-85
Shelton, CT 06484
Phone: (203) 944-0235
Fax: (203) 567-8033
E-mail: broche@rochepia.com
gpia@rochepia.com